UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BROOKE HELMES,

                              Plaintiff,

        v.                                              1:06-CV-358

SOUTH COLONIE CENTRAL SCHOOL
DISTRICT, JILL CURRIER, HARRY
KACHADURIAN, THOMAS A. BROWN,
and the BOARD OF EDUCATION OF SOUTH
COLONIE CENTRAL SCHOOL DISTRICT,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                         OF COUNSEL:

HARRIS, CONWAY & DONOVAN, P.L.L.C.    MICHAEL C. CONWAY, ESQ.
Attorneys for Plaintiff
5 Clinton Square
The Patroon Building
Albany, New York 12207

RYAN & SMALLACOMBE, P.L.L.C.         JOHN F. MOORE, ESQ.
Attorneys for Defendants
100 South State Street
Suite 800
Albany, New York 12207

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

        Plaintiff Brooke Helmes ("plaintiff") brings this pregnancy-based employment

discrimination action against defendants South Colonie Central School District ("District"),

South Colonie Central School District Board of Education ("Board of Education"), Jill Currier

("Currier"), Harry Kachadurian ("Kachadurian"), and Thomas A. Brown ("Brown") (collectively "defendants") under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by the Pregnancy Discrimination Act of 1978 and the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e–2000e-17 (2003 & Supp. 2007), and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290-301 (McKinney 2005 & Supp. 2008). Specifically, plaintiff asserts two causes of action; one for pregnancy discrimination under Title VII (First Cause of Action), and another for pregnancy discrimination under the NYSHRL (Second Cause of Action).

Defendants move for summary judgment under Federal Rule of Civil Procedure 56. Plaintiff opposes. Plaintiff cross-moves to amend the complaint. Defendant opposes. Oral argument was heard on September 28, 2007, in Albany, New York. Decision was reserved.

## II. FACTS

In July 2002, the District appointed plaintiff to a three-year probationary position as an English teacher at South Colonie High School. At that time, it was understood that plaintiff's employment could be terminated at any time during the three-year probationary period, but that if it was not, the District would decide whether to grant or deny tenure to plaintiff.

The process by which the District evaluates probationary teachers for tenure is contained in a document titled "Probationary Teacher Evaluation Process" ("PTEP"). Plaintiff received a copy of the PTEP upon her appointment. Under the PTEP, each probationary teacher is assigned a primary evaluator and may be assigned one or more secondary evaluators. During a given school year, each probationary teacher is the subject of three formal evaluations by an evaluator based on classroom observation. Formal evaluations are

conducted on a pre-scheduled basis.  Probationary teachers may be the subject of informal, unannounced "pop-in" evaluations as well.  After each formal evaluation, the evaluator produces a "Formative Classroom Observation Report" ("formative report") and, toward the end of the school year, a "Summative Evaluation Report" ("summative report") based on the three formative reports.  Formative reports generally contain four sections: activities observed; teacher performance; commendations; and recommendations.  Summative reports generally contain three sections: performance (which encompasses planning, classroom management, instruction, assessment, and professional responsibilities); commendations; and recommendations.  At the end of both formative and summative reports the evaluator must check one of three boxes.  The top box reads: "Is making appropriate progress toward tenure at this time"; the middle box reads: "Must address the recommendations in this evaluation to make appropriate progress toward tenure"; and the bottom box reads: "Is not making appropriate progress towards tenure at this time."  (See, e.g., Currier Aff. Ex. 1 at 10, 33, 36.)  Following the issuance of a formative report, the probationary teacher typically meets with the evaluator to discuss the contents of the report, then signs the report.  Formative and summative reports are considered by Tenure Review Committees when making tenure determinations each spring.  Tenure Review Committees typically consist of the probationary teacher's evaluator, department supervisors, the school principal, and the assistant superintendent for instruction.

During plaintiff's probationary period, her primary evaluator was defendant Currier, the District's K-12 English Language Arts Supervisor.  Plaintiff's secondary evaluators were defendant Kachadurian, Principal of South Colonie High School, and Donald Joss, an associate principal.  During the 2002-03 school year, all three of plaintiff's formative reports

were generally positive but contained some recommendations for improvement.  The summative report recommended that plaintiff "should continue to work collaboratively with the members of the department to ensure our students are exposed to a rich learning experience aimed at meeting their needs, especially in the area of Regents preparation."  (Moore Aff. Ex. NN.)  Nonetheless, her evaluators checked the top box on all three formative reports and the summative report for the 2002-03 school year.

During the 2003-04 school year, plaintiff's first formative evaluation was conducted by Currier in October 2003.  The formative report associated with that evaluation was generally positive but recommended that plaintiff should "work to check for understanding prior to releasing her students to work independently."  Id. Ex. OO.  Nonetheless, Currier checked the top box on that report.

Weeks later, in November 2003, plaintiff told Kachadurian and Currier that she was pregnant.  Kachadurian congratulated plaintiff and was generally supportive.  Currier told her that she already knew based on plaintiff's appearance.  At that time, neither Kachadurian nor Currier said anything to plaintiff indicating that her pregnancy or ensuing maternity leave would adversely affect her employment situation.

The second formative report, based on a January 2004 evaluation conducted by Kachadurian, was generally positive but recommended that plaintiff "continue to work closely with other English teachers and set a goal to challenge and prepare out [sic] students for mastery on English regents."  Id. Ex. QQ.  Nonetheless, Kachadurian checked the top box on that report.

On February 5, 2004, plaintiff formally announced her maternity leave to the District by completing a "Child Care Action Form."  Shortly thereafter, Joss conducted plaintiff's third

formative evaluation for that school year.  The formative report associated with that evaluation was generally positive but recommended that plaintiff remind students to speak loudly so their classmates can hear them.  Joss also made a note telling plaintiff to "[h]ave a happy, healthy maternity leave."  Id. Ex. RR.  Joss checked the top box on that report.

The 2003-04 summative report, signed by Currier in March 2004, was generally positive but recommended that plaintiff "should continue to work with both the members of her department and those individuals on the 7-12 English Language Arts Instructional Council to ensure our students are exposed to a rich learning experience aimed at meeting their needs."  Id. Ex. SS.  That apparent criticism notwithstanding, Currier checked the top box on plaintiff's 2003-04 summative report.

The Board of Education approved plaintiff's request for maternity leave from April 19 until June 30, 2004, noting that she was expected to return to her teaching responsibilities in September.  Plaintiff began her maternity leave on April 19, 2004.  In July 2004, after giving birth to a girl, plaintiff informally notified the District that she wished to take an extended unpaid maternity leave for the first half of the 2004-05 school year.  After discussing with Currier the possibility of teaching part-time and learning that to do so she would have to resign her probationary position, plaintiff formally requested an unpaid child care-related leave of absence for the first half of the 2004-05 school year.  The Board of Education approved plaintiff's request, noting that she was expected to return to her teaching responsibilities on January 31, 2005.

In October 2004, due to plaintiff's extended leave, the Board of Education approved a change in the ending date of plaintiff's probationary period from July 31, 2005, to January 31, 2006.

Plaintiff returned to work on January 31, 2005.  On February 8, after students left for the day, the English department held a meeting to discuss which ninth grade students would be placed in the advanced placement program for the 2005-06 school year. Afterward, teachers were asked to stay and participate in the actual selection of students for the advanced placement program.  At 3:30 p.m. plaintiff told Currier, who headed the meeting, that she needed to leave early to pick up her daughter at day care.  Currier responded by telling plaintiff, in what plaintiff describes as a rude and patronizing tone (see Moore Aff. Ex I at 84), that she needed to stay at the meeting and listen because she would have to deal with students' parents during the second half of the year.  Plaintiff told Currier that her presence was unnecessary during the actual selection process because she did not know her students well enough and her substitute, Rebecca Myers ("Myers"), was present at the meeting and had grades and notes pertaining to the abilities of her students.  Currier obliged and plaintiff left the meeting early.  Plaintiff telephoned Currier later that day to apologize for having to leave early and explained why she had to do so.  Currier told plaintiff that she understood and asked plaintiff to let her know ahead of time if she had to leave early in the future.

On February 14, 2005, plaintiff was covering a ninth period class for another english teacher when Currier walked in and asked where the teacher was.  Plaintiff told Currier that the teacher had to leave.  Later, the teacher received a letter from Currier stating that she committed an infraction for leaving without telling an administrator.  The letter, a copy of which was given to Kachadurian, mentioned plaintiff's name but did not say anything negative about her.

On February 17, 2005, Currier conducted an unannounced "pop-in" evaluation of plaintiff during one of her classes. Currier's contemporaneous notes and subsequent testimony indicate that plaintiff sat on her desk for part of the class period and did not move around the room very much, did not write objectives or an agenda on the board, and read aloud from an assigned text for eleven minutes which contained words such as "pissed off," "bitch," and "whore" without pausing for discussion. After the "pop-in" evaluation, plaintiff went to Currier's office and asked her why the evaluation had taken place, noting that she had not been the subjected to such an evaluation since her first year. She also asked Currier if she had any problems with her teaching. Currier told plaintiff that she had the right to conduct such evaluations for any teacher at any time and suggested that plaintiff move around the classroom more during lessons.

During the first week of March 2005, plaintiff and Currier sat down for a routine meeting to review some of her students' failing second quarter grades. Plaintiff told Currier that she had not yet contacted all of those students' parents because she did not have their telephone numbers. Currier told plaintiff to contact all of those students' parents and plaintiff agreed, acknowledging that that was now her responsibility not Myers's.

On March 18, 2005, Currier conducted a formal evaluation of plaintiff and produced a formative report that was less positive than previous formative reports. While Currier commended plaintiff for moving around the classroom more and checking for understanding before releasing the students to work in independent groups, she also stated that plaintiff used only "some elements of effective teaching." (Moore Aff. Ex. XX.) Currier recommended that plaintiff "should continue to work to improve her communication with the parents of her students" and "must strive to contact the guardians of those individuals who are at risk of not

successfully completing the course and/or those students whose grades have dropped from one quarter to the next." Id. Currier also recommended that plaintiff "should continue to work collaboratively with the members of the English Department to improve upon our program to ensure that the students who attend South Colonie continue to receive the best educational program possible." Id. Finally, based on her subsequent review of a quiz plaintiff announced in class the day of the evaluation, Currier recommended that plaintiff "should strive to provide the students with whom she works with instructional activities and materials that are reflective of the state standards and the type of assessments with which they will be met in grade 11." Id. Currier checked the middle box on that report which, to reiterate, states that the teacher "[m]ust address the recommendations in this evaluation to make appropriate progress toward tenure."

Plaintiff met with Currier on March 29, 2005, to discuss the formative report associated with the March 18 evaluation. Currier told plaintiff that she needed to be more rigorous in her teaching of special education students. Currier also told plaintiff that she checked the middle box because plaintiff's lessons and assessments were not geared toward preparing students for Regents examinations and because plaintiff needed to improve her communication with her students' parents. At the time, plaintiff did not disagree with the particular recommendations in the formative report but disagreed with Currier's decision to check the middle box. After plaintiff met with Currier she sought out her union representative and asked whether she should sign the formative report even though she disagreed with Currier's decision to check the middle box. Plaintiff's union representative recommended that she sign the formative report despite her misgivings, and she did.

In early April 2005, the Tenure Review Committee for South Colonie High School's English department convened to discuss tenure decisions with respect to third-year probationary English teachers, including plaintiff.  The members of the Tenure Review Committee were Currier, Kachadurian, and Assistant Superintendent for Instruction Alan Aldi ("Aldi").  (Joss was not involved at this point because he retired after the 2003-04 school year.)  The Tenure Review Committee decided that plaintiff's probationary employment would be terminated.  Aldi reported the Tenure Review Committee's decision to defendant Brown, the District Superintendent.

On April 7, 2005, Kachadurian summoned plaintiff to his office for a meeting with him and Currier.  At the meeting Kachadurian informed plaintiff that she would be denied tenure and her probationary employment would be terminated because she was "not a good fit" at South Colonie High School.  (Kachadurian Dep. 60-61; see Helmes Aff. ¶ 53.) Kachadurian told plaintiff that the decision had nothing to do with her as an individual, but rather was based on her job performance.

During the meeting, Kachadurian handed plaintiff a document entitled "Notice of Termination of Probationary Teacher" signed by Brown.  The notice informed plaintiff of Brown's decision to recommend to the Board of Education that she be denied tenure and her probationary employment be terminated.  Plaintiff met with her union representative, Joe Botta ("Botta"), and obtained copies of her formative and summative reports.  She also requested, pursuant to New York Education Law § 3031, a written statement of reasons for Brown's decision.

Plaintiff met with Botta on April 13 or 14, 2005, and Botta told her that he spoke with Brown and Brown said that he would discuss with Aldi the possibility of granting plaintiff

a fourth year of probationary employment under a JUUL agreement which would delay the

tenure decision until the following year.

On several days later, in response to her request for a written statement of reasons for

Brown's decision, plaintiff received a letter from Brown dated April 15, 2005, which stated the

following:

> Listed below are the reasons related to the termination of your
> probationary term.  They include:
>
> 1.  Inability to plan and structure instruction to meet the needs of
> individual students.
>
> 2.  Teaching techniques lack direction in terms of learning goals and
> objectives.
>
> 3.  Inadequate planning with other teachers.
>
> Improvement in these areas has not been sufficient to recommend you for
> tenure.

(Moore Aff. Ex. ZZ.)

On April 19, 2005, plaintiff met with Brown to discuss the April 15 letter.  Brown told

plaintiff that the reasons contained in the April 15 letter were a condensation of the actual

reasons for her termination, but stated that he was unable to provide her with more specific

reasons at that time.  Plaintiff told Brown she thought she was terminated because she was

pregnant and took an extended maternity leave.  He disagreed but offered to share her

response to the April 15 letter, which she reduced to writing, with Kachadurian and Aldi.

About a week later, Brown informed Botta that the District would not grant plaintiff a

fourth year of probation under a JUUL agreement because Kachadurian and Aldi advised

against it.  Plaintiff then met with Kachadurian and told him she thought she was terminated

because she was pregnant and took an extended maternity leave.  Kachadurian disagreed

and suggested that plaintiff resign before the Board of Education was required to act on

Brown's recommendation that she be terminated.  Plaintiff resigned her probationary position

in May 2005 and filed this action less than a year later.

## III.  <u>STANDARD OF REVIEW</u>

Summary judgment is granted only if there is no genuine issue of material fact and

the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>see</u>

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986); <u>Silver v. City</u>

<u>Univ. of New York</u>, 947 F.2d 1021, 1022 (2d Cir. 1991).  The court will not try issues of fact

on a motion for summary judgment, rather it will determine "whether the evidence presents a

sufficient disagreement to require submission to a [fact-finder] or whether it is so one-sided

that one party must prevail as a matter of law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.

242, 251-52, 106 S. Ct. 2505, 2512 (1986).  "The party seeking summary judgment bears the

burden of establishing that no genuine issue of material fact exists and that the undisputed

facts establish her right to judgment as a matter of law."  <u>Rodriguez v. City of New York</u>, 72

F.3d 1051, 1060-61 (2d Cir. 1995).  A material fact is one that would "affect the outcome of

the suit under the governing law," and a dispute about a genuine issue of material fact occurs

if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving

party."  <u>Anderson</u>, 477 U.S. at 248, 106 S. Ct. at 2510; <u>R.B. Ventures, Ltd. v. Shane</u>, 112

F.3d 54, 57 (2d Cir. 1997).  In determining whether a genuine issue of material fact exists, a

court must resolve all ambiguities and draw all reasonable inferences against the moving

party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct.

1348, 1356 (1986); <u>Gibbs-Alfano v. Burton</u>, 281 F.3d 12, 18 (2d Cir. 2002).

## IV.  <u>DISCUSSION</u>

To reiterate, defendants move for summary judgment on plaintiff's pregnancy discrimination claims under Title VII (<u>First</u> Cause of Action) and the NYSHRL (<u>Second</u> Cause of Action), and plaintiff cross-moves to amend the complaint.

### A.  <u>Defendants' Motion for Summary Judgment</u>

### 1.  <u>Title VII Claim</u>

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C.A. § 2000e-2(a) (2003).  Under Title VII, "the terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . ."  <u>Id</u>. § 2000e(k).

Title VII employment discrimination claims are analyzed under the three-step burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817 (1973).  Under that framework, the plaintiff first must establish a prima facie case of discrimination, which typically requires a showing that (1) he is a member of a protected class, (2) he was qualified for the position, (3) he suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination.  <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 802, 93 S. Ct. at 1824.

If the plaintiff establishes a prima facie case of discrimination, a presumption of discrimination arises and the burden then shifts to the employer to produce a legitimate, nondiscriminatory reason for the adverse employment action.  Id. at 802, 93 S. Ct. at 1824.

If the employer produces such a reason, the presumption of discrimination dissipates and the burden shifts back to the plaintiff to show that the asserted legitimate nondiscriminatory reason is pretext for discrimination.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, 113 S. Ct. 2742, 2747 (1993); James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000).  It is important to emphasize that plaintiff must show that the reason asserted is pretext for discrimination.  In other words, a mere showing of pretext may not be enough as "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated . . . remains at all times with the plaintiff."  St. Mary's, 509 U.S. at 507, 113 S. Ct. at 2747 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093 (1981)).

### a.  **Prima Facie Case**

Defendants concede that plaintiff has satisfied the third element of the prima facie case, i.e., she has shown that she suffered an adverse employment action when she was denied tenure.  Defendants also concede that plaintiff has satisfied the first element of the prima facie case, i.e., she has shown that she was a member of a protected class.  However, since defendants' concession in that regard is based on an improper reading of the law, (see Pt. IV.A.1.a.i, infra), it will be set aside and that element of the prima facie case will be given due treatment below.

### i.  **Member of a Protected Class**

Defendants argue that the protected class in pregnancy discrimination cases is women "of childbearing age who took a maternity leave"; however, they cite no authority in support of that view. (Defs.' Mem. 7.) Plaintiff argues that the protected class in pregnancy discrimination cases is pregnant women and cites several cases from other circuits which espouse that view.[1] Neither party is entirely correct.

The protected class in pregnancy discrimination cases is "women affected by pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). Whether a woman is "affected by pregnancy, childbirth, or related medical conditions" is a question best answered on a case-by-case basis. Certainly, women who are pregnant at or very near the time of the adverse employment action are members of the protected class, as are women who are on maternity leave or recently have returned to work from maternity leave when the employment action occurs. However, at some point in time such women are no longer "affected by pregnancy, childbirth, or related medical conditions" and, thus, are not protected under the Pregnancy Discrimination Act. See, e.g., Keller v. Great Lakes Collection Bureau, Inc., 2005 WL 2406002, at *5 (W.D.N.Y. Sept. 29, 2005) ("There is nothing in this record to suggest that, two years after giving birth, plaintiff was still affected by the pregnancy. Her status as a working mother of two children is not enough to bring her into the protected class of pregnant workers under the PDA."). When that occurs exactly depends on the facts and circumstances in each particular case.

In this case, Kachadurian notified plaintiff that she would be denied tenure and her probationary employment would be terminated approximately nine weeks after she returned

---

[1] Miles v. Dell, 429 F.3d 480, 490 (4th Cir. 2005); Gleklen v. Democratic Cong. Campaign Comm., Inc., 199 F.3d 1365, 1368 (D.C. Cir. 2000); Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 726 (7th Cir. 1998).

from maternity leave.  Moreover, plaintiff was subjected to a "pop-in" evaluation on which

defendants claim to have relied in making that employment decision, approximately two

weeks after she returned from maternity leave.  While the focus should be on the date of the

adverse employment action, the fact that that action was set in motion, at least in part, by an

earlier event renders that event relevant to the discussion.  Under the circumstances in this

case, plaintiff was still "affected by pregnancy" when she suffered the adverse employment

action.

Therefore, plaintiff was a member of a protected class.

### ii. __Qualified for the Position__

To satisfy the second element of the prima facie case, plaintiff need only make the

"minimal showing that she possesses the basic skills necessary for performance of [the] job."

Gregory v. Daly, 243 F.3d 687, 696 (2d Cir. 2001) (internal quotation marks and emphasis

omitted; alteration in original).  The Second Circuit has made clear that "the qualification

prong must not be interpreted in such a way as to shift into the plaintiff's prima facie case an

obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory

basis for its decision."  Id. (citing Powell v. Syracuse Univ., 580 F.2d 1150, 1155 (2d Cir.

1978)).  In other words, in cases such as this one, where the defendant's asserted legitimate

nondiscriminatory reason is that the plaintiff was not qualified for the position, the plaintiff

need not disprove that asserted reason as part of her prima facie case; the minimal showing

described above is sufficient.

Plaintiff has shown that she possessed the basic skills necessary for performance

of her job as an English teacher at South Colonie High School.  And since the evidence

suggests that the duties of a tenured English teacher at South Colonie High School are

essentially the same as the duties of a probationary English teacher, plaintiff has shown that she also possessed the basic skills necessary for performance of a job as a tenured English teacher. That is not say, of course, that plaintiff was necessarily qualified for tenure or that the District improperly denied tenure to her based on the view that she was unqualified. Those are entirely separate matters that need not be addressed at this stage. The fact that plaintiff has shown that she was minimally qualified for the position is sufficient for now.

Therefore, plaintiff was qualified for the position.

### iii. Inference of Discrimination

Plaintiff can satisfy the fourth element of the prima facie case by demonstrating that the denial of tenure occurred under circumstances giving rise to an inference of unlawful discrimination or, alternatively, by showing that her position remained open and was ultimately filled by someone outside of the protected class. See Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995); Kerzer v. Kingly Mfg., 156 F.3d 396, 401 (2d Cir. 1998). Some courts, including the Second Circuit, have stated that a plaintiff can satisfy the fourth element of the prima facie case by showing that her position remained open and was ultimately filled by a non-pregnant employee, implying that the protected class is limited to pregnant women. As discussed above, the protected class in pregnancy discrimination cases is women "affected by pregnancy, childbirth, or related medical conditions," not pregnant women. (See Pt. IV.A.1.a.i, supra.) Thus, to satisfy the fourth element plaintiff can show that her position remained open and was ultimately filled by someone other than a woman affected by pregnancy, childbirth, or related medical conditions.

Plaintiff's position and the position of another probationary English teacher who was denied tenure were filled by two women, Jaclyn Lupe and Melissa Vecchio. The evidence

suggests that neither of these women were pregnant or otherwise affected by pregnancy at the time they were hired by the District.  Therefore, plaintiff has shown that her position remained open and was ultimately filled by someone outside of the protected class.  Since that is sufficient to satisfy the fourth element, whether plaintiff has raised an inference of unlawful discrimination will be addressed in the "pretext for discrimination" discussion below. (See Pt. IV.A.1.c., infra.)

Therefore, plaintiff has established a prima facie case of pregnancy discrimination, shifting the burden to defendants to articulate a legitimate nondiscriminatory reason for the adverse employment action.

### b.  Legitimate Nondiscriminatory Reason

In general terms, defendants' asserted legitimate nondiscriminatory reason for denying tenure to plaintiff and terminating her probationary employment is that she was "not an appropriate candidate for tenure."  (Defs.' Mem. 14.)  Since, on its face, that reason is neither legitimate nor nondiscriminatory, it is necessary to examine defendants' reasons for concluding that plaintiff was "not an appropriate candidate for tenure."

To reiterate, Brown's April 15 letter to plaintiff stated the following:

Listed below are the reasons related to the termination of your probationary term.  They include:

1.  Inability to plan and structure instruction to meet the needs of individual students.

2.  Teaching techniques lack direction in terms of learning goals and objectives.

3.  Inadequate planning with other teachers.

Improvement in these areas has not been sufficient to recommend you for tenure.

(Moore Aff. Ex. ZZ.)

Currier has made various representations, both contemporaneously and during the course of this litigation, as to her reasons for recommending that plaintiff's probationary employment be terminated. According to Currier, she believed plaintiff was not qualified for tenure based in large part on her formative and summative reports. Currier points to the 2002-03 summative report which recommends that plaintiff "should continue to work collaboratively with the members of the department to ensure our students are exposed to a rich learning experience aimed at meeting their needs, especially in the area of Regents preparation." Id. Ex. NN. Similarly, Currier points to the 2003-04 reports which recommend that plaintiff should "work to check for understanding prior to releasing her students to work independently," id. Ex. OO, and "continue to work with both the members of her department and those individuals on the 7-12 English Language Arts Instructional Council to ensure our students are exposed to a rich learning experience aimed at meeting their needs," id. Ex. SS. Despite the fact that all such reports were "top box" reports, Currier contends that the recommendations contained therein indicate that plaintiff's teaching style "remained static" and generally left something to be desired during the her first two years. (Currier-Penn Aff. ¶ 7.)

Currier also states that similar inadequacies surfaced after plaintiff returned in January 2005. Currier claims that during the February 2005 "pop-in" evaluation plaintiff did not move around the room as much as she should have, did not write objectives or an agenda on the board, and read aloud for eleven minutes from an assigned text that contained words such as "pissed off," "bitch," and "whore" without pausing for discussion. Currier also points to the March 2005 formative report which recommended that plaintiff

"should continue to work to improve her communication with the parents of her students" and "must strive to contact the guardians of those individuals who are at risk of not successfully completing the course and/or those students whose grades have dropped from one quarter to the next." (Moore Aff. Ex. XX.)  Currier also recommended in that report that plaintiff "should continue to work collaboratively with the members of the English Department to improve upon our program to ensure that the students who attend South Colonie continue to receive the best educational program possible." Id.  Finally, based on her subsequent review of the quiz plaintiff announced in class that day, Currier recommended that plaintiff "should strive to provide the students with whom she works with instructional activities and materials that are reflective of the state standards and the type of assessments with which they will be met in grade 11." Id.  While the March 2005 formative report also commended plaintiff in certain areas, Currier checked the middle box on that report indicating that plaintiff "[m]ust address the recommendations in this evaluation to make appropriate progress toward tenure."

When plaintiff met with Currier on March 29, 2005, to discuss the March 2005 formative report, Currier told plaintiff that she needed to be more rigorous in her teaching of special education students.  Currier also told plaintiff that she checked the middle box because plaintiff's lessons and assessments were not geared toward preparing students for Regents examinations and because plaintiff needed to improve her communication with her students' parents.

Kachadurian has also made contemporaneous and subsequent representations as to his reasons for recommending that plaintiff's probationary employment be terminated. While he has stated that he largely relied on Currier's assessment of plaintiff's qualifications,

at the meeting between him, Currier, and plaintiff on April 7, 2005, Kachadurian told plaintiff that her probationary employment would be terminated because she was "not a good fit" at South Colonie High School.  (Kachadurian Dep. 60-61; see Helmes Aff. ¶ 53.)  He has also stated that after plaintiff returned from maternity leave he noticed less of an effort on her part to engage students in the hallway during and after school hours.

Therefore, defendants have articulated legitimate nondiscriminatory reasons for concluding that plaintiff was not qualified for tenure, shifting the burden back to plaintiff to show that such reasons are pretext for pregnancy discrimination.

### c. Pretext for Discrimination

At the outset, plaintiff contends that some of defendants' asserted reasons for concluding that she was not qualified for tenure – namely those listed in Brown's April 15 letter, Kachadurian's statement that plaintiff was "not a good fit," and Currier's statement that plaintiff's teaching style remained "static" – are inconsistent, and that is evidence of pretext. However, those reasons are not inherently inconsistent and all tend to support defendants' general assertion that plaintiff was not qualified for tenure.

Plaintiff also argues that defendants' reliance on her pre-maternity leave formative and summative reports as evidence of her teaching inadequacies is evidence of pretext because they were all "top box" reports.  While those reports did contain some recommendations for improvement, including ambiguous recommendations that plaintiff "continue to" work collaboratively with her colleagues, it would be reasonable to infer that plaintiff's inadequacies were relatively insignificant.  It would also be reasonable, then, to infer that defendants' assertion that plaintiff's teaching style remained static and generally left something to be desired during the first two years of her probationary period is pretext.

While defendants were generally supportive of plaintiff after learning of her pregnancy in November 2004, inferences of pretext and discrimination may be drawn from the events that occurred shortly after plaintiff returned from maternity leave.  Plaintiff claims she noticed a change in Currier's attitude toward her upon her returned.  Namely, plaintiff claims that Currier used a rude and patronizing tone in discussions with her at an English department meeting on February 8, 2005.  Plaintiff also claims that Currier was unpleasant toward her during other meetings in March 2005.  Also, plaintiff was subjected to a "pop-in" evaluation approximately two weeks after her return.  While "pop-in" evaluations may be conducted for any teacher at any time, it appears that they were a relatively rare occurrence for third-year probationary teachers.  The fact that those events were followed by plaintiff's first "middle box" report in March 2005, does not necessarily suggest that plaintiff did not deserve a "middle box" report; however, considering the temporal proximity of that chain of events in relation to plaintiff's return from maternity leave, it would not be unreasonable to infer discrimination therefrom.

Moreover, the fact that plaintiff's position was filled by someone outside of the protected class (see Pt. IV.A.1.a.iii, supra), while by itself not especially weighty, is another factor from which an inference of discrimination may be drawn.

Plaintiff has also shown that English teachers outside of the protected class, namely Deborah LaBrake ("LaBrake") and Shawn McQuade Durant ("Durant"), received similar recommendations for improvement in their formative and summative reports during their probationary periods but, unlike plaintiff, were ultimately granted tenure.  As defendants point out, plaintiff has not sufficiently analogized her situation with those of LaBrake and Durant so as to raise a strong inference of discrimination.  However, plaintiff has analogized

their situations such that, when taken together with the other evidence, an inference of discrimination would be reasonable.

Similarly, plaintiff has raised questions of fact as to whether other probationary District teachers who were in the protected class were subjected to pregnancy discrimination. Plaintiff has produced evidence that first-year probationary middle-school teacher Cynthia Gately ("Gately") received a "top box" formative report in connection with her first formative evaluation, but received a "middle box" formative report after becoming pregnant and announcing her maternity leave. Just before Gately began her maternity leave, she was subjected to a "pop-in" evaluation by Currier, and received a "bottom box" formative report. Gately was denied tenure and forced to resign.

Plaintiff has produced evidence that first-year probationary teacher Joanna Whitman ("Whitman") was verbally commended by Currier at the close of her first formative evaluation, but then treated harshly and given a "bottom box" report after telling Currier that she was pregnant. Whitman was denied tenure and forced to resign.

Plaintiff has produced evidence that probationary guidance counselor Jennifer Amorosi ("Amorosi") received a "middle box" summative report for the 2002-03 school year after becoming pregnant and taking maternity leave despite receiving all "top box" formative reports for that school year. After becoming pregnant a second time, Amorosi received a "bottom box" report and was forced to resign.

Finally, plaintiff has produced evidence that third-year probationary English teacher Megan Carlin ("Carlin") was subjected to a "pop-in" evaluation by Currier after returning from maternity leave, received a "middle box" report, and was told she would be denied tenure in February 2005. However, after announcing that she was pregnant again in March 2005, the

District offered to extend her probationary period and eventually granted her tenure.  Plaintiff

argues that although the District granted tenure to Carlin, it did so out of fear that it would be

subject to a lawsuit for pregnancy discrimination in light of Carlin's recent pregnancy.

Defendants dispute plaintiff's characterization of those teachers' situations and

have produced evidence of their own which tends to show that those teachers were not

discriminated against.  However, plaintiff has raised questions of fact as to whether such

discrimination occurred and, if it did, whether and to what extent it bears on plaintiff's claims.

### 2.  <u>NYSHRL Claim</u>

Since employment discrimination claims under Title VII and the NYSHRL are

analyzed under the same standards, <u>see</u> <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 42 n.1

(2d Cir. 2000); <u>Forrest v. Jewish Guild for the Blind</u>, 3 N.Y.3d 295, 305 n.3 (2004), the

preceding discussion, while couched in terms of federal law, applies equally plaintiff's

NYSHRL claim (<u>Second</u> Cause of Action).  Moreover, to the extent that defendants move for

summary judgment on plaintiff's NYSHRL claim as it pertains to the individual defendants, it

also will be denied.  Plaintiff has raised questions of fact as to whether the individual

defendants are liable for aiding and abetting discriminatory conduct under New York

Executive Law § 296(6).

### B.  <u>Plaintiff's Cross-Motion to Amend the Complaint</u>

Finally, plaintiff's cross-motion to amend the complaint will be granted as it merely

seeks to add the following sentence: "Plaintiff's position remained open and was ultimately

filled by persons from outside of her protected class."  (Conway Aff. Ex. S.)  In light of the

evidence presented by the parties in connection with the summary judgment motion, that

allegation is deemed admitted and no responsive pleading is allowed.  Moreover, defendants'

sole argument in opposition – that the cross-motion is futile – is unpersuasive in light of the fact that their motion for summary judgment will be denied.  The Clerk will be directed to docket Exhibit S to the Conway Affidavit as the Second Amended Complaint, thus, no further pleadings need be filed by either party in connection with plaintiff's motion to amend the complaint.

## V. <u>CONCLUSION</u>

Viewing the evidence in a light most favorable to the nonmoving plaintiff, she has produced evidence calling defendants' legitimate nondiscriminatory reasons into question. Her evidence indicates, among other things, that shortly after returning from maternity leave she was subjected to harsh treatment and a "pop-in" evaluation by Currier; she received a "middle box" report in March 2005 despite receiving "top box" report up until that time; she was replaced by a person outside of the protected class; some teachers outside of the protected class with similar credentials were granted tenure; and some teachers in the protected class with similar credentials were denied tenure or otherwise treated unfavorably. While plaintiff has not produced a single, weighty piece of evidence showing pregnancy discrimination, the cumulative effect of the evidence she has produced is enough to defeat summary judgment.  Thus, defendants' motion for summary judgment will be denied, except that the Board of Education will be dismissed from the action as there is no evidence that the Board of Education or any member thereof was involved in any discriminatory conduct. Indeed, plaintiff has conceded as much.

Therefore, it is

ORDERED that

1.  Defendants' motion for summary judgment is DENIED, except that defendant Board of Education of South Colonie Central School District is DISMISSED; and

2.  Plaintiff's cross-motion to amend the complaint is GRANTED.

IT IS SO ORDERED.

The Clerk is directed to docket Exhibit S to the Conway Affidavit as the Second Amended Complaint.

Dated:  July 8, 2008
        Utica, New York.

_____
United States District Judge

- 25 -